DAVID ROCAH
STAFF ATTORNEY



July 9, 2007

Robert N. McDonald
Chief Counsel
    Opinions and Advice
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND FOUNDATION
3600 CLIPPER MILL ROAD
SUITE 350
BALTIMORE, MD 21211
T/410-889-8555
F/410-366-7838
WWW.ACLU-MD.ORG

OFFICERS AND DIRECTORS
ELLIOTT ANDALMAN
PRESIDENT

SUSAN GOERING
EXECUTIVE DIRECTOR

C. CHRISTOPHER BROWN
GENERAL COUNSEL

    **Re: *Request for Opinion Regarding Gaithersburg Anti-Solicitation Ordinance***

Dear Mr. McDonald:

  We write on behalf of the American Civil Liberties Union of Maryland to provide you with comments on the May 15, 2007 "Request for Legal Opinion" submitted by the Mayor and City Council of Gaithersburg ("City") regarding the City's recent amendments to Section 15-9 of the City Code. Those recent amendments are included within City Ordinance No. O-4-07 (the "Ordinance"), attached hereto as Exhibit A, which the City refers to as the "anti-solicitation ordinance."

  Although the City's "Request for Legal Opinion" (Exhibit B) and supporting legal memorandum from the City Attorney ("City Attorney Memo") (Exhibit C) do not mention as much, the Ordinance was designed specifically to prohibit certain forms of employment solicitation by and of day laborers within Gaithersburg city limits. As discussed more fully below, when crafting the Ordinance, the City did not discuss or consider and did not intend to reach other types of speech. This sort of content-based restriction does not pass muster under the First Amendment. But, even read broadly to apply to persons other than day laborers, the Ordinance criminalizes a certain type of speech (solicitation speech) based on its content, while permitting other forms of speech to continue. The City has not justified these intrusions on First Amendment rights by identifying any legitimate government interests to which the Ordinance is actually aimed. Indeed, as discussed below, the Ordinance is not narrowly tailored to the City's proffered interests in pedestrian and traffic safety. Nor does it allow any adequate alternative channels of communication for the restricted speech.

  It therefore is not surprising that, at the time of enactment, members of the City Council expressed their view that the Ordinance was unconstitutional. The Montgomery County State's Attorney recently echoed that view, advising the City that "it was the consensus of the lawyers in his office that the Ordinance as written would not withstand constitutional challenge."[1] We agree, and believe that the Ordinance runs afoul of clearly established First Amendment standards.

---

[1] May 15, 2002 Request for Legal Opinion from Mayor Sidney A. Katz (Exhibit B) at 1.

Robert N. McDonald, Esq.
July 9, 2007
Page 2

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

We hereby respectfully submit our analysis of the Ordinance for your consideration in formulating your response to the City's Request for Legal Opinion.

### A.    Background Of The Ordinance:  Focus on Day Laborers

The Ordinance is the result of recommendations by a "Task Force" convened by the City in 2005 to address concerns regarding solicitation of employment of and by day laborers. *See* Gaithersburg Day Laborer Task Force Report, Mayor and City Council Work Session, April 10, 2006 (Exhibit D).

Generally speaking, day laborers are persons who work by the day, without any contractual term of employment, performing services such as gardening, moving, light construction, housework, and painting. The day laborers within Gaithersburg are comprised primarily of persons of Latin American descent. *Id.* at 7. These men and women sometimes are referred to as "jornaleros."

Day laborers within Gaithersburg traditionally have expressed their availability for employment by standing on a public sidewalk or other public way or on private parking lots with permission, usually between the hours of 6:30 a.m. and 9:30 a.m., Monday through Sunday. *Id.* Over the last several years, day laborers in Gaithersburg primarily have gathered at the Spanish Catholic Center at 117 North Frederick Avenue, property leased by Montgomery County at 17 North Frederick Avenue, the Grace Methodist Church at 119 North Frederick Avenue (and an adjacent parking lot), and nearby 7-Eleven and Duron Paint stores on North Frederick Avenue. *Id.* 4-6, 30. The vast majority of Gaithersburg's day laborers live near those gathering sites and walk from their residences to those locations. *Id.* at 6-7.

Prospective employers typically have driven to these locations, pulled into parking areas, and approached the day laborers with offers of employment. As Gaithersburg City Manager David B. Humpton acknowledged in an August 31, 2006 memo to Gaithersburg Mayor Sidney A. Katz and the Gaithersburg City Council ("Humpton Memo") (Exhibit E), "the current congregation site(s) of the parking lot adjacent to Grace Methodist Church and the church property itself, 7-Eleven, and Duron Paint all have parking that will accommodate cars and trucks that pull off of Route 355." Thus, the day laborers typically express their availability for employment away from roadways and in a manner that does not impact traffic safety.

The City has acknowledged that the day laborers generally assemble peaceably. Indeed, the Humpton Memo acknowledges that, "[w]ith regard to the need for an officer dedicated to monitoring the day laborers," Gaithersburg police officer Lt. Bonvillian "stated that the day laborers do not need a baby sitter in the form of a police officer." Exhibit E at 38. Likewise, the report notes that "Sgt. Scarff of the Gaithersburg Police said that police were not seeing the crime they had in the past, which he credited to the supervision and continuing effort on the part of the police to educate individuals on inappropriate behavior. More recently, Sgt. Scarff said that it has been seven months

since the police have received a valid complaint about the behavior of the day laborers."
*Id.*

Nevertheless, responding in part to complaints that City officials recognized stemmed from complainants mistaking day laborers for "homeless drunks that frequent the area," in December 2005, the City convened a "Task Force" to address the "issues" presented by day laborers. *See* Exhibit D at 2. The Task Force focused exclusively on solicitation of employment by and of day laborers and did not consider solicitation relating to any other groups or any other forms of communication. Although day laborers were not presenting any significant traffic hazards and otherwise were not committing widespread violation any of the plethora of laws already on the books that could address any potential pedestrian and traffic concerns,[2] the Task Force issued a report to the Mayor and City Council in April 2006, concluding that the jornaleros should be permitted to gather only in one designated location – a so-called "day laborer center" – and should not be permitted to solicit employment at any other location. *Id.* at 4.

The City adopted the Task Force's findings, but refused to permit a day laborer center within city limits. After Montgomery County officials agreed to provide a temporary site for a day laborer center outside Gaithersburg city limits, miles from where day laborers traditionally have gathered, the City enacted the Ordinance on February 20, 2007.

When considering the Ordinance, the City Council focused exclusively on measures that would preclude day laborers from seeking employment anywhere other than at a designated day laborer center, regardless of whether seeking employment in other locations actually posed any traffic or pedestrian safety hazards. In fact, the City did not undertake any analysis of traffic or pedestrian hazards posed by day laborer solicitation of employment. Nor did City Council meetings address any communications or solicitation by groups other than day laborers that might cause traffic or pedestrian hazards. Rather, the minutes of the City council meetings reflect a single-minded focus on day laborers:

- At a City Council meeting on August 7, 2006, City Manager Humpton recommended that the City should consider enacting an anti-solicitation ordinance once a day laborer center site had been secured. Exhibit F.

- At a City Council meeting on October 3, 2006, City Manager Humpton stated that he would "ask the City

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

---

[2] Among the Gaithersburg ordinances that are available to address any pedestrian, traffic and safety concerns related to day laborers are those that address: parking prohibition at specified places (§ 14-7); disorderly conduct (§ 15-2); urinating or defecating in public (§ 15-7); and disturbing the peace (§ 15-8). Similarly, Maryland State law prohibits: disturbing the peace and disorderly conduct (Md. Code Ann., Crim. Law Art., § 10-201); trespass on posted property (§ 6-402); and wanton trespass on private property (§ 6-403). The Maryland Transportation Article also regulates the stopping, standing, and parking of motor vehicles (subsection 10).

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

Attorney to work with Planning Director Ossont and Police Chief Viverette to draft an anti-solicitation ordinance for introduction a[s] soon as possible. I will recommend adoption of such an ordinance until a site for a center has been identified [sic]." Exhibit G.

- At a City Council meeting on October 16, 2006, Assistant City Manager Tomasello stated that an anti-solicitation ordinance may have to be enacted as an emergency ordinance to be concurrent with the opening of the day laborer center. Exhibit H.

- At a City Council meeting on November 6, 2006, City Manager Humpton recommended the adoption of an anti-solicitation ordinance that would "make 'unofficial' gatherings spots such as 17 North Frederick Avenue unusable." Exhibit I.

- At a City Council meeting on January 2, 2007, "[s]everal City Council Members expressed support for the [anti-solicitation] ordinance, but believe[d] that the ordinance should go hand and hand with the identification of a site on county property in order to resolve the issues. Enforcement concerns were raised without a site being established." Exhibit J.

There was no discussion of addressing other forms of speech or solicitation speech by groups other than day laborers – except to express concern that other forms of solicitation speech *not* be affected by the Ordinance. Indeed, the minutes of the November 6, 2006 meeting reflect that, when the proposed ordinance initially was introduced, "concern was expressed that [the proposed ordinance] prohibited conduct, that the language not be too vague. It was also expressed that traditional community fundraising activities not be affected by the proposed language." Exhibit I, at § XI.5.

The language of the final version of the Ordinance enacted by the City explicitly reflects the specific focus on day laborers. The Ordinance expressly states that it will become effective only upon the opening of the day laborer center (part (f)) and, consistent with the Task Force's recommendation, criminalizes solicitation of employment unless it occurs at the designated day laborer center. *See* Ordinance, part (c)(1) (prohibited conduct does not include "any activity conducted within or in accordance with procedures of a lawful approved formal assembly site for day workers …").

However, despite the City's clear intent to restrict speech of day laborers, the Ordinance that the City adopted is remarkable in its breadth:

1. It shall be unlawful for any person, while occupying as a pedestrian any portion of a public or private roadway,

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

sidewalk, driveway, parking area, or alley, including drive lanes, medians and curbs, to solicit or attempt to solicit employment, donations, alms or subscriptions, from any pedestrian who temporarily exits a vehicle, or from any person occupying or traveling in a vehicle, on a roadway, sidewalk, driveway, parking area, or alley.

2. It shall be unlawful for any person occupying or traveling in a vehicle, or who temporarily exits a vehicle, to solicit or attempt to solicit employment, donations, alms or subscriptions, from a person who is a pedestrian on a public or private roadway, sidewalk, driveway, parking area, or alley, including drive lanes, medians, and curbs.

Even before adopting such broad language, City officials were aware that the Ordinance likely was unconstitutional. In a public meeting, City Councilmember Geri Edens indicated that "I really have problems with the law in that, as a lawyer, I don't think its going to withstand scrutiny and I think it's going to be virtually impossible to apply. . . in a nondiscriminatory way." Sebastian Montes, *Gaithersburg is Area's First to Ban Curbside Hires*, THE GAZETTE, Feb. 21, 2007, http://www.gazette.net/stories/022107/montnew154354_32324.shtml. City Council members Michael A. Sesma and Stanley J. Alster also publicly expressed concern about the legality of the Ordinance, but voted in favor of its passage because they believed that it would ensure usage of the Montgomery County temporary day laborer center. *Id.* Furthermore, the Task Force had informed the Mayor and City Council that other, similar ordinances all over the country had been challenged and struck down as unconstitutional. *Id.* Nevertheless, the Ordinance became effective on April 16, 2007.

**B.      The Ordinance Targets Conduct Protected by the First Amendment**

The Ordinance prohibits, *inter alia*, the solicitation of "employment, donations, alms or subscriptions" on every public and private "roadway, sidewalk, driveway, parking area, or alley" within the City of Gaithersburg. Just like political statements and artistic expressions, the act of soliciting employment in such public *fora* is an act of expression protected by the First Amendment. *See, e.g., Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632-33 (1980) (noting that solicitation speech has been "long protected" under the First Amendment); *Bates v. State Bar of Arizona,* 433 U.S. 350, 363 (1977) ("[O]ur cases long have protected speech even though it is in the form of … a solicitation to pay or contribute money.").

Moreover, the public roadways and sidewalks areas such as those targeted by the Ordinance are the "quintessential public forums" in which people are entitled to exercise such First Amendment rights. *Burson v. Freeman,* 504 U.S. 191, 196 (1992); *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45 (1983). These public areas have "by long tradition or by government fiat … been devoted to assembly and debate,"

and expression in such places "has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Burson*, 504 U.S. at 196-97 (citations and quotations omitted).

In such a "traditional public forum," "First Amendment protections are subject to heightened scrutiny," *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 573 (1987), and the government's ability to restrict speech is "sharply circumscribed." *Perry*, 460 U.S. at 45. *See also United States v. Grace*, 461 U.S. 171, 177 (1983) (the government's ability to restrict speech in public *fora* is "very limited"). The government's ability to restrict speech in private *fora* is even more limited. *Van Bergen v. State of Minnesota*, 59 F.3d 1541, 1553 (8th Cir. 1995) (private property is "the province of those who own and occupy them, and the choice of what speech to permit and what to reject is the private property owner's, not the government's.").

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

The City's analysis of the Ordinance completely glosses over the fact that the Ordinance is so broad that it inhibits speech in private *fora*, instead focusing exclusively on the standards associated with speech restrictions in public *fora*. But the Ordinance's reach into speech on private property alone renders it unconstitutional. *See, e.g., Van Bergen*, 59 F.3d at 1553.

With respect to the Ordinance's application in public *fora*, the City correctly notes that the constitutional validity of the Ordinance depends first on whether it is content-based or content neutral. If it is content-based, the Ordinance is "presumptively invalid." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002). A content-based restriction on speech may withstand scrutiny only if the City carries its burden of demonstrating that the restriction is necessary to achieve a "compelling state interest" and that it is "narrowly tailored" to that interest. *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003) (citing *Perry*, 460 U.S. at 45). But, even if the Ordinance was a content neutral, "time, place and manner" restriction, it still is subject to rigorous scrutiny and will survive only if narrowly tailored to a significant government interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In either case, the speech restriction must leave open ample alternative channels of communication. *Id.*; *Perry Educ. Ass'n*, 460 U.S. at 45.

The Ordinance here is not merely some facially content-neutral "time, place or manner" restriction that applies to all speech,[3] it is a facially discriminatory law that punishes only certain forms of speech based upon their content. The ordinance was targeted specifically at day laborers. But, even read broadly to apply to other persons, the Ordinance punishes only solicitation speech, while leaving unchecked other forms of speech that could have the same (or worse) consequences. The City has failed to justify this restriction as narrowly tailored to a compelling government interest. Even assuming the City's purported goals in pedestrian and traffic safety are legitimate and "compelling" interests, the Ordinance is too broad to be considered narrowly tailored. For the same

---

[3] Time, place and manner restrictions apply to "all speech irrespective of content." *Carey v. Brown*, 447 U.S. 455, 470 (1980).

Robert N. McDonald, Esq.
July 9, 2007
Page 7

reasons, even if the Ordinance was content-neutral, it is not sufficiently narrowly tailored to a significant government interest. And, in any event, the Ordinance does not provide adequate alternative channels of communication in which people could engage in the restricted speech. For all these reasons, detailed below, the Ordinance is clearly unconstitutional.

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

1.       **The Ordinance Is An Impermissible Content-Based Restriction On Speech.**

Generally speaking, "[a] rule is defined as a content-based restriction on speech when the regulating party must examine the speech to determine if it is acceptable." *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1155 (9th Cir. 2003). *See also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 ((1993) (holding that city newsrack policy was content-based because "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack"); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (restriction is content-based where, in order to enforce it, an official "must necessarily examine the content of the message that is conveyed").

Under this rule, the Ordinance here is a content-based restriction because Gaithersburg authorities must determine whether a person's speech is aimed at soliciting "employment, donations, alms or subscriptions" or at some other end. Only solicitation speech is punishable; speech containing other content (such as political, artistic or religious speech or greeting an acquaintance) is not – even though speech containing other content might have just as great (or, indeed, greater) impact on traffic or pedestrian safety. "Thus, by any commonsense understanding of the term, the ban in this case is 'content-based.'" *City of Cincinnati*, 507 U.S. at 429 (policy was "content based" where it banned newsracks containing commercial handbills, but did not ban newsracks containing newspapers); *Burson*, 504 U.S. at 197 (statute was content based where it prohibited speech "related to a political campaign" within 100 feet of polling place but did not reach "other categories of speech, such as commercial solicitation, distribution, and display"); *Boos v. Barry*, 485 U.S. 312, 318-19 (1988) (plurality) (ordinance was content based because "[o]ne category of speech" is prohibited while "[o]ther categories of speech ... are permitted"); *Carey*, 447 U.S. at 462 (statute was content based where it prohibited non-labor picketing, but permitted residential labor picketing).[4]

_____

[4] Some decisions have suggested that the determination of whether a restriction is content-based or content-neutral may depend in part on the "justification" for the restriction. *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) ("In determining whether a regulation is content based or content neutral, we look to the purpose behind the regulation; typically, 'government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech'.") (quoting *Ward*, 491 U.S. at 791) (emphasis added). Here, however, there is no justification for treating solicitation speech any different than any other form of speech. Other forms of speech are just as (or more) likely to impact the safety of pedestrians and motorists than day laborers soliciting employment. A soapbox orator who communicates to passing motorists about a political figure or proselytizes in favor of a religion or a sidewalk

Robert N. McDonald, Esq.
July 9, 2007
Page 8

The City argues that the Ordinance is content neutral because it does not discriminate between different types of *solicitation* speech. *See* City Attorney Memo at 2-3. Even though the City only discussed regulation of day laborer employment solicitation when considering the Ordinance, the City Attorney's Memo argues that the Ordinance *could* be applied equally to all forms of solicitation – ranging from college students soliciting donations for a charitable cause to persons soliciting employment. *Id.* at 2. In that case, the City contends that equal discrimination against solicitation of "employment, donations, alms and subscriptions" by all persons is better than discriminating only against solicitation of employment. *Id.* at 3. But, even if the Ordinance were enforced in that manner (which, given the legislative history, requires quite a leap of faith) the City confuses *viewpoint* neutrality for *content* neutrality.

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

The fact that the City could enforce the Ordinance to prohibit all different kinds of solicitation speech may make the ordinance viewpoint-neutral within the category of regulation of solicitation speech. But the Ordinance still discriminates against solicitation speech as compared to all other forms of speech. It therefore is not content-neutral – which is the governing test. Content-neutral time, place and manner restrictions apply to "all speech irrespective of content." *Carey*, 447 U.S. at 470. They "appl[y] equally to music, political speech, and advertising." *City of Cincinnati v. Discovery Network Inc.*, 507 U.S. 410, 428 (1993). But the Ordinance here does not apply to all different forms of speech equally; it discriminates specifically against speech with solicitation content.

Accordingly, the Ordinance is "presumptively invalid," *Alameda Books*, 535 U.S. at 434, and can be salvaged only if the City carries its burden of demonstrating that the restriction is necessary to achieve a "compelling state interest" and that it is "narrowly tailored" to that interest. *Goulart*, 345 F.3d at 248 (citing *Perry*, 460 U.S. at 45). But the Ordinance here is not narrowly tailored to a compelling state interest. In fact, the Ordinance is not sufficiently tailored to satisfy even the less exacting standards that would apply to a content-neutral restriction on speech. *See, e.g., Perry*, 460 U.S. at 45 (content neutral "time, place and manner" restrictions must be "narrowly tailored to serve a significant government interest").

### 2. The Ordinance Is Not Narrowly Tailored To A Legitimate Government Interest.

The Ordinance is not motivated by any legitimate government interest. But, even if it were, the Ordinance is too broad to be narrowly tailored to any claimed interests.

---

entertainer juggling balls or eating fire can be just as (or more) dangerously distracting to passing motorists and pedestrians. Yet, the Ordinance does not reach their expressive conduct. There is no justification for treating the two types of conduct differently when they have the same effect. *See Nat'l Federation of the Blind v. Fed. Trade Comm'n*, 420 F.3d 331, 345 (4th Cir. 2005) (government action is invalid where it "discriminates against some speakers but not others without a legitimate neutral justification for doing so.").

a)    An Interest In Forcing Latino Day Laborers To Seek Employment Only Outside City Limits Is Not A Compelling Or Significant Government Interest.

While the Ordinance purportedly is designed to "provide a mechanism to ensure the safety and well being of pedestrians, vehicle drivers and solicitors" and "prohibit[] the conduct which creates significant traffic and pedestrian safety hazards" (Ordinance § 15-9 (b)), the record makes clear that the City was motivated by different interests.

The City already had numerous state laws and city ordinances available to regulate conduct posing any traffic or pedestrian safety hazards. *See, e.g.*, Maryland Transportation Article subsection § 21-1001 (regulating the stopping, standing, and parking of motor vehicles) and § 21-507 (prohibiting any pedestrian from standing in a roadway to solicit a ride, employment, or business from the occupant of any vehicle), Md. Code Ann. §§ 21-1001, 21-507 (2007); GAITHERSBURG, MD., CODE §§ 14-7 (2006) (parking prohibition at specified places). The City was aware of these options, and pursued a new ordinance only after convening a Task Force designed specifically and exclusively to address "issues" presented by Latino day laborers.

But, in examining and ultimately adopting an ordinance purportedly designed to address traffic and pedestrian safety hazards, neither the Task Force nor the City examined conduct by any group of persons other than day laborers – except to express a concern that activities of other groups of persons should not be affected by any regulation of Latino day laborers. *See* Minutes of City Council Meeting (Nov. 6, 2006) (Exhibit I) ("It was also expressed that traditional community fundraising activities not be affected by the proposed language."). And, although the Ordinance purportedly was directed at traffic and pedestrian safety concerns, the City never even attempted to identify or quantify any traffic and pedestrian safety hazards posed by day laborers soliciting employment. Instead, the Ordinance simply prohibits day laborers from soliciting employment anywhere other than at a day laborer center that the City refused to locate within the city limits.

Under these circumstances, the City's purported "interest" in enacting the Ordinance simply does not withstand scrutiny. The history and express language of the Ordinance make clear that the Ordinance is designed to prevent Latino day laborers from gathering in visible public and private spaces within city limits, regardless of whether or not their conduct has any detrimental secondary effects. A desire to force Latino day laborers to seek employment out of sight and out of mind does not further any legitimate government interest.

b)    The Ordinance Is Not Narrowly Tailored To The Interests The Ordinance Claims To Promote.

Even if the Ordinance truly was designed to reduce "traffic and pedestrian safety hazards" and even if those aims constitute a compelling or significant government

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

interest, the Ordinance nonetheless must be declared constitutionally invalid because it is not narrowly tailored to those stated purposes.

To be narrowly tailored, the City must show that the Ordinance is not too broad – *i.e.*, it does not burden substantially more speech than is necessary to further the government interest. *See Ward*, 491 U.S. at 799. Or, stated differently, the City "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (citing *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (finding government action narrowly tailored "only if each activity within the proscription's scope is an appropriately targeted evil")).

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

Here, the Ordinance sweeps too broadly and prohibits speech activities that pose no threat to traffic or pedestrian safety. Solicitation of "employment, donations, alms or subscriptions" can and routinely does occur without individuals running into roadways, without motorists stopping in active drive lanes, and without impeding traffic flow or endangering pedestrians.

Indeed, day laborers within Gaithersburg generally solicit employment by standing on public sidewalks or, more often, in parking lots owned by private parties or leased by Montgomery County. (Exhibit D). Prospective employers typically pull into those parking areas, park, and then approach the day laborers with offers of employment. *Id.* As the City has acknowledged "the current congregation site(s) of the parking lot adjacent to Grace Church and the church property itself, 7-Eleven, and Duron Paint all have parking that will accommodate cars and trucks that pull off of Route 355." *Id* at 30. Thus, solicitation by and of day laborers typically occurs away from roadways and without impacting traffic safety. However, the Ordinance is so broad that it criminalizes such activity in the same way as solicitation that actually does impact traffic or pedestrian safety.

The Ordinance is so broad that it can be used to prohibit other forms of (non-day laborer) solicitation speech that also clearly pose no risk to traffic or pedestrians. On its face, the Ordinance would apply to such activities as a Salvation Army bell ringer soliciting donations in a shopping center parking lot or a student standing on a sidewalk and soliciting donations for the high school band. The City itself volunteers that the Ordinance could be used to punish "college students soliciting donations for a charitable cause." City Attorney's Memo at 2. In fact, the Ordinance is so broad that it could prohibit a motorist from pulling into a private driveway, temporarily exiting his vehicle, and discussing whether a neighbor's teenage son would be interested in performing yard work. Clearly, the Ordinance burdens substantially more speech than is necessary to further the stated government interests. That the City has no interest in (or intention of) prohibiting such activity does nothing to save the ordinance, and indeed highlights the inevitability of discriminatory and arbitrary enforcement, and the constitutional infirmity of the law.

The overbreadth of the Ordinance is only underscored by the availability of various other, less restrictive means to address traffic and pedestrian hazards –

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

alternatives that properly target behavior, rather than speech. *See Galvin v. Hay*, 374 F.3d 739, 753 (9th Cir. 2004) ("[T]he availability of several obvious less-restrictive alternatives is pertinent in deciding whether the regulation burdens substantially more speech than is necessary to achieve its purposes."). As noted above, there already are existing laws that more directly address the City's stated concerns regarding traffic and pedestrians that do not require such broad restrictions on First Amendment rights. For example, the Maryland Transportation Article regulates the stopping, standing, and parking of motor vehicles (subsection 10). The Maryland Code likewise addresses potential traffic and pedestrian hazards by requiring pedestrians to use crosswalks when between adjacent intersections (MD. CODE ANN. § 21-503 (c) (2007)) and, when not in a marked crosswalk, to yield the right of way to any vehicle. *Id.* § 21-503 (a). Further, to preclude traffic "delay and obstruction" or "congestion and blockage," the City Council has the authority to put up traffic signs prohibiting "standing" or parking in potentially congested areas. In each of these examples, conduct is regulated rather than speech, and each constitutes a less restrictive, and legitimate means of addressing the City's concern about the safety of pedestrians and motorists.[5]

In these circumstances, federal district courts have had little trouble concluding that similar (indeed, less restrictive[6]) anti-solicitation ordinances were not narrowly tailored to a significant government interest. *See, e.g., Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA) v. Burke*, 2000 WL 1481467, *9 (C.D. Cal. 2000) (invalidating county ordinance that prohibited solicitation of automobile drivers by persons standing on public streets because the ordinance reached solicitation on sidewalks and "burdens a substantial amount of speech that has not been shown to cause the feared harms to traffic flow and safety"); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 475 F.Supp.2d 952, 965 (C.D. Cal. 2006) (holding anti-solicitation ordinance was not narrowly tailored to government interests in traffic and pedestrian safety); *Comite de Jornaleros de Glendale v. City of Glendale*, No. CV 04-3521 SJO (C.D. Cal. May 16, 2005) (concluding that ban on solicitation speech was not narrowly tailored to city's asserted interests in traffic congestion and the safety of drivers and pedestrians). This Court should reach the same result.

---

[5] In a sense, the Ordinance is also too narrow to be suitably tailored to the City's stated interests in traffic and pedestrian safety. The Ordinance prohibits solicitation speech, but permits other forms of speech in the same locations that could be equally (or more) distracting to drivers and hazardous to pedestrians. The Ordinance allows political orators, religious speakers, jugglers, acrobats and other sidewalk entertainers to express themselves in the same *fora*, regardless of the effects of their expression on traffic and pedestrians. In these circumstances, "[t]here simply is no 'reasonable fit'" between a concern about" pedestrian and traffic safety "and a ban on solicitation speech alone." *Comite de Jornaleros de Glendale v. City of Glendale*, No. 04-3521, at *9 (C.D. Cal. Filed May 13, 2005). "Therefore, ... the Ordinance is not narrowly-tailored." *Id.*

[6] The Ordinance here is more restrictive the anti-solicitation restrictions invalidated in the above-cited cases because it extends beyond public roadways to public sidewalks and even private property.

Robert N. McDonald, Esq.
July 9, 2007
Page 12

### 3. The Ordinance Is Invalid Because It Restricts Speech Without Leaving Open Ample Alternative Channels Of Communication.

Even if the Ordinance was not a presumptively invalid content-discriminatory restriction on speech (it is) and even if it was narrowly tailored to a legitimate, neutral government interest (it is not), the Ordinance still would violate the First Amendment because it does not leave open ample, alternative channels in which day laborers (and others) can communicate their solicitation speech. *See Perry Educ. Ass'n*, 460 U.S. at 45 (content-neutral restriction on speech also violates the First Amendment if it does not leave open "ample alternative channels of communication"); *Ward*, 491 U.S. at 791; *Nat'l Federation of the Blind*, 420 F.3d at 350 ("time, place manner restrictions on speech … must 'leave open ample alternative channels of communication'"); *Goulart*, 345 F.3d at 248.

It is well-established that "the burden of proving alternative avenues of communication rests on" the City. *Seung Chun Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000). Here, the City has banned solicitation of or by pedestrians and motorists or those who have temporarily exited vehicles on both public and private property within city limits. There is no other place in which such speech can take place within Gaithersburg.[7]

There are no other avenues at all for such communication by persons other than day laborers. While the City Attorney's letter disingenuously refers to an "employment center" just outside the City, that center in fact is exclusively for day laborers. It does not provide an alternative for other prospective employment solicitation, nor for solicitation of any other sort other than employment. And the center itself is only a *temporary* facility which is *outside the city limits*. It is not a viable alternative channel even for day laborers.

Most day laborers in Gaithersburg reside near and walk to the current gathering places for day laborers. But the new day laborer center is located several miles away – outside walking distance of the current gathering places and, indeed, outside city limits. The City Attorney's Memo suggests that some shuttle buses may be available, but there is no concrete indication of what busing will be available or how long it will last. Nor is there any guarantee that prospective employers will travel to the new center to recruit

---

[7] The City Attorney's Memo suggests that solicitors could stand on a grassy area in between a sidewalk and a parking lot. *Id*. at 5. If true, that only underscores how poorly tailored the Ordinance is. An Ordinance that criminalizes solicitation activity on the sidewalk and in the parking lot, but permits the very same activity only a couple of feet away (in between the sidewalk and parking lot) cannot possibly be narrowly tailored.

The City Attorney's Memo also suggests that charitable organizations could engage in fundraising activity outside a retail establishment on the establishment's property. *Id*. But the Ordinance applies to both private and public property and very well could reach such conduct if it occurred, for example, on the establishment's sidewalk or parking lot.

AMERICAN CIVIL LIBERTIES UNION OF MARYLAND

prospective workers – thereby depriving those workers of their intended audience. Under these circumstances, the day laborer center simply does not provide an adequate alternative channel for speech with respect to day laborers. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 475 F. Supp. 2d 952, 968 (C.D. Cal., 2006) (concluding that presence of day laborer centers outside city borders did not provide adequate alternative channels for speech prohibited within city borders).

Moreover, there is no guarantee that the day laborer center itself will continue to be available. The beginning effective date of the Ordinance was expressly conditioned on the opening of the center, but the Ordinance does not guarantee that the center will continue to remain open. Nor does the Ordinance cease to be in effect if the center is closed. And Montgomery County explicitly has stated that it is providing the space for the day laborer center only on a temporary basis. (Exhibit K). Because there is no guarantee that the day laborer center will remain open, it is not a sufficient alternative channel of communication. *See Comite de Jornaleros de Glendale*, No. 04-3521, at *10 (invalidating anti-solicitation ordinance in part because there was no guarantee that day laborer would continue to be available as an alternative channel of communication).

Under these circumstances, the City has not established ample alternative channels for the speech prohibited by the Ordinance, and the Ordinance should be invalidated on this ground alone. *See Burke*, 2000 WL 1481467 at *11 (invalidating county anti-solicitation ordinance because county failed to show ample alternative avenues of communication).

4.    **The Ordinance Cannot Be Salvaged Based On The Recent, Initial Challenge To A Herndon, Virginia Ordinance; Courts Around The Country Routinely Have Found Similar Provisions To Be Unconstitutional.**

As a last gasp, the City Attorney argues that, because the Ordinance is loosely modeled on a Herndon, Virginia ordinance it somehow passes constitutional muster. It does not. It is true that a Virginia state-court trial judge refused to strike down the Herndon ordinance on an initial challenge, but that ruling is on appeal. The Herndon ordinance and the zoning ordinance that was enacted to complement it both face additional legal challenges and, in light of the clear First Amendment principles laid out above, are not likely to withstand further scrutiny. In any event, the Gaithersburg Ordinance is even more restrictive than the Herndon ordinance.

The Gaithersburg Ordinance prohibits not only solicitation of employment, but also solicitation of "donations, alms or subscriptions." Similarly, while Herndon at least provided a day laborer center as an alternative channel of communication within its borders, Gaithersburg refused to do so. As a result, as discussed above, Gaithersburg

effectively has cut off *all* channels for communicating this speech and has banished all day laborers from seeking employment within Gaithersburg.[8]

The Gaithersburg Ordinance is much more akin to similar measures recently invalidated in Glendale and Redondo Beach California. In *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 475 F.Supp.2d 952 (C.D. Cal. 2006), the district court concluded that Redondo Beach's anti-solicitation ordinance, which largely tracks the language of the Gaithersburg Ordinance, was facially invalid. The district court found that the ordinance was not narrowly tailored to Redondo Beach's stated interests in traffic and pedestrian safety because, as is the case here, the ordinance reached persons who were merely standing on sidewalks away from the flow of traffic, who had lawfully parked their vehicles, or who otherwise did not pose any traffic or pedestrian hazards. *Id.* at 964-65. Likewise, as here, there were a "myriad" of less restrictive means by which Redondo Beach could have addressed its stated traffic and safety concerns, including enforcement of existing traffic laws (*id.* at 966), but its ordinance failed to leave open alternative avenues of communication. *Id.* at 967.

Similarly, in *Comite de Jornaleros de Glendale v. City of Glendale*, No. CV 04-3521 SJO (C.D. Cal. May 16, 2005) (Exhibit L), the federal district court concluded that another similar anti-solicitation ordinance was facially invalid under the First Amendment. Much like the *Redondo Beach* case, the *Glendale* court concluded that the city's anti-solicitation ordinance was not narrowly tailored to any government interest because it reached conduct occurring on curbs and that otherwise did not present any traffic or safety concerns. *Id.* at *8. Moreover, like *Redondo Beach* and the instant case, the Glendale ordinance failed to provide any adequate alternative channels for the restricted speech. *Id.* at *9-10. The presence of a day laborer center did not provide an adequate alternative channel because, *inter alia*, it was within the control of the city, was not guaranteed in the ordinance, and had no promise of indefinite funding.

These cases are much more reflective of the proper analysis for the anti-solicitation ordinance at issue here. Indeed, the City was well aware when it enacted the Ordinance that courts all around the country had invalidated ordinances like Gaithersburg's. *See* Montes, *Gaithersburg is Area's First to Ban Curbside Hires*, THE GAZETTE, Feb. 21, 2007, http://www.gazette.net/stories/022107/montnew154354_32324.shtml (noting that the Task Force informed the Mayor and City Council that other, similar ordinances all over the country had been challenged and struck down as unconstitutional). If anything, the Ordinance here is even more restrictive than those invalidated in Redondo Beach, Glendale and other cases, because the Ordinance here reaches not only public curbs, sidewalks and parking areas, but also private property. As such, the Ordinance runs even

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

---

[8] The City Attorney also mistakenly asserts that an "anti-solicitation ordinance" in Vista, California survived a legal challenge because of a severability clause. Exhibit C, at 6. The ordinance at issue in that case required employer registration. It was not an anti-solicitation ordinance.

Robert N. McDonald, Esq.
July 9, 2007
Page 15


further afoul of the First Amendment that those similar measures that have been declared unconstitutional by the federal courts.

## CONCLUSION

For all of the foregoing reasons, we believe the Ordinance violates the First Amendment.

\* \* \*

Thank you for your consideration. We welcome further discussion on any of these issues. Please feel free to contact us with any questions.

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

Respectfully yours,


David Rocah
Staff Attorney


Jerome A. Murphy
David L. Haga
CROWELL & MORING LLP
Cooperating Attorneys with the ACLU of
 Maryland Foundation